FILED
2024 Aug-30  PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DEBORAH CARPENTER BURGETT,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 2:23-cv-01256-RDP** |
| } | |
| **MARTIN O'MALLEY,** } | |
| **COMMISSIONER, SOCIAL SECURITY** } | |
| **ADMINISTRATION,** } | |
| } | |
| **Defendant.** } | |

**<u>MEMORANDUM OF DECISION</u>**

Plaintiff Deborah Carpenter Burgett brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB"). *See also* 42 U.S.C. § 405(g). After careful review of the record and the briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed and this matter remanded.

**I.    Proceedings Below**

Plaintiff filed her application for a period of disability and DIB on May 26, 2020. (Tr. 96). The application was denied initially on August 11, 2020, and upon reconsideration on December 2, 2020. (Tr. 147, 160). After a was hearing held on September 15, 2021 (Tr. 71-95), Administrative Law Judge Renee Blackmon Hagler ("ALJ") issued a decision on October 4, 2021, finding Plaintiff was not disabled. (Tr. 124-34). On April 25, 2022, the Appeals Council remanded the case to the ALJ for further proceedings. (Tr. 142-43). The ALJ held a second hearing on

October 3, 2022. (Tr. 45-70). In her second decision, dated December 22, 2022, the ALJ determined that Plaintiff had not been under a disability within the meanings of §§ 216(i) and 223(d) at any time from January 1, 2015 (the alleged onset date) through December 31, 2019 (the date last insured). (Tr. 24-36). After the Appeals Council denied Plaintiff's request for review of the ALJ's second decision (Tr. 1), that decision became the final decision of the Commissioner, and therefore a proper subject of this court's appellate review.

At the October 3, 2022 hearing, Plaintiff testified that she was fifty-six years old and held a Bachelor's Degree. (Tr. 52). Plaintiff last worked in December 2014 in the finance department of Blue Cross of Alabama as an enrollment services specialist. (Tr. 53, 337). Plaintiff alleges that she suffers from fibromyalgia, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome (hereinafter "chronic fatigue syndrome"), chronic migraines, anxiety, and depression. (Tr. 54).

Plaintiff complains of debilitating migraines that currently occur around four days per week, but they previously occurred every day. (Tr. 59, 64). When she experiences these migraines, Plaintiff states that she is nauseous, dizzy, unable to function, and must lay in a dark room, cover her eyes, and use an icepack to alleviate her pain. (Tr. 60). Additionally, she complains of severe fatigue that takes over her entire body and lasts for weeks at a time. (Tr. 59). On days where her fatigue is extremely bad, Plaintiff states that she needs her husband's help to shower and get dressed. (Tr. 59). Plaintiff also struggles with anxiety and depression. (Tr. 60).

Plaintiff takes a host of prescribed and over-the-counter medication to treat her symptoms. She takes the following medication on a daily basis: Cartia for mitral valve prolapse (180 milligrams 1x each day); Topamax for migraines (100 milligrams 2x each day); Zocor for cholesterol (40 milligrams 1x each day); Synthroid for thyroid issues (100 MCGs 1x each day); Wellbutrin XR for depression (150 milligrams 1x each day); Buspar for anxiety (15 milligrams 2x

each day); Propranolol for anxiety (10 milligrams, 1-2x each day as needed); Vitamin D (50,000 IC 1x each week); Tramadol for pain (50 milligrams 1x each day); Flexeril (10 milligrams, 1-2x each day); and Adderall (10 milligrams as needed). (Tr. 56-58, 372-73). Each month, she receives an injection of Aimovig for her migraines. (Tr. 56). In addition, she regularly takes over-the-counter medicine such as Tylenol, Motrin, and Excedrin Migraine. (Tr. 55, 60). Although Plaintiff acknowledges that the medicine helps, she states that nothing takes her pain completely away. (Tr. 59).

In 2008, Plaintiff began seeing Dr. John Riser at Alabama Neurology Associates for her migraines. (Tr. 687). Dr. Riser diagnosed Plaintiff with migraine headaches and cervical degenerative disk disease and prescribed her Darvocet, Topamax, and Flexeril. (Tr. 687). At later appointments, Dr. Riser noted that Plaintiff had intact motor skills and no limitations with her gait. (Tr. 650, 655, 660, 665, 673, 675, 677). However, at most of these appointments, Plaintiff continued to complain of headaches. (Tr. 642, 661, 675). In 2010 and 2011, Dr. Riser opined that Plaintiff's headaches were associated with stress and allergy problems, but were overall stable. (Tr. 647, 667, 673, 675). In February 2011, Dr. Riser noted that Plaintiff had relatively infrequent headaches while taking Topamax, Ultram, and Flexeril and seemed to be doing "very well." (Tr. 670). During multiple visits in 2012 and 2013, Plaintiff informed Dr. Riser that her headaches were stable and under control. (Tr. 647, 652, 657, 662). Plaintiff attributed her headaches to stress but was still able to work full-time. (Tr. 647, 652, 1087).

In May 2014, Plaintiff returned to Dr. Riser with complaints of extreme fatigue, weakness, and exhaustion over the previous six months. (Tr. 642). Dr. Riser prescribed Plaintiff a trial dose of Cymbalta, which initially helped Plaintiff's pain. (Tr. 456, 645). However, at follow up appointments, Plaintiff continued to complain of pain and emotional issues, and she requested Dr.

Riser fill out an FMLA form related to her work. (Tr. 632, 637). Although Dr. Riser initially increased Plaintiff's Cymbalta dosage in an effort to reduce her symptoms (Tr. 641), he ultimately decreased the dosage after her symptoms worsened. (Tr. 636). During this period, Dr. Riser opined that Plaintiff's headaches and musculoskeletal pain seemed to have intensified. (Tr. 632, 637, 642).

In November 2014, Plaintiff continued to complain of migraines, anxiety, and memory loss, and informed Dr. Riser that she was no longer able to work. (Tr. 631). Dr. Riser opined that, although Plaintiff's issues were most likely related to her medication and nothing in her evaluation suggested any type of dementia, she needed additional lab work and an evaluation by a psychologist or psychiatrist. (Tr. 627, 631). An MRI of Plaintiff's head revealed ventricular asymmetry in the brain, with what appeared to be a right porencephalic cyst involving the lateral ventricle. (Tr. 680).

In December 2014, Plaintiff was referred to see Dr. Jack Denver for her fibromyalgia. (Tr. 699). At her first appointment, Plaintiff complained of an inability to function for over six months due to pain, which she rated a 6/10. (Tr. 699-700). Plaintiff complained of feeling like her hands and feet were constantly swollen and about pain in her neck, shoulders, left hip, and left knee. (Tr. 699). Dr. Denver's examination revealed that Plaintiff's gait and station was within normal limits, but that the range of her extension was limited by 50% and her fibromyalgia tender points at 10 and 18 were significantly painful. (Tr. 701). At a follow-up appointment a month later, Plaintiff rated her pain a 7/10 on average, with her best pain level of the previous month being a 3/10 and her worst being a 9/10. (Tr. 703). Dr. Denver recommended discontinuing her use of Flexeril and reducing her use of Topamax. (Tr. 704). Plaintiff reported an increase in her migraines when the Topamax was decreased and rated her average pain level at 6-7/10. (Tr. 706).

In August 2015, Plaintiff informed Dr. Riser that she had stopped taking Cymbalta, and that her overall pain level was about the same, or slightly worse, since doing so. (Tr. 619). Dr. Riser's evaluation of Plaintiff showed normal musculoskeletal and motor skills and he opined that she appeared to be doing "fairly well from a headache standpoint." (Tr. 624). But, in December 2015, Plaintiff complained that the frequency of her headaches had increased to twenty-five headaches each month, with each lasting four-plus hours and causing pain, nausea, and vomiting. (Tr. 717). Both Dr. Riser and Dr. Denver recommended Botox injections. (Tr. 618, 719). Although the Botox injections lowered the frequency of Plaintiff's headaches (Tr. 612, 722), Plaintiff suffered an adverse reaction to the second dose that resulted in flu-like symptoms, alopecia, palpations, and anxiety and was unable to continue receiving them. (Tr. 602, 722, 724).

During later visits with Dr. Denver, Plaintiff reported increased pain that mildly limited her resting, moderately limited her sitting, climbing, and sexual activity, and severely limited her running, bending, working, and hobbies. (Tr. 769). Dr. Denver believed that Plaintiff's medications were the root of her fatigue and recommended reducing her Topamax dosage; however, at the next visit, Plaintiff reported that lowering her dosage caused more fatigue. (Tr. 774, 778).

From 2011 to 2016, Plaintiff also went to Dr. Lora Pound as her primary physician. (Tr. 514-89). Dr. Pound repeatedly recorded that Plaintiff's blood sugar, kidney function, liver enzymes, potassium levels, and thyroid hormone levels were normal and those should not be causing fatigue. (Tr. 547, 550, 555).

In August 2016, Dr. Riser noted that Plaintiff's headaches were occurring frequently enough to necessitate raising the dosage of her Neurontin. (Tr. 605-06). In November 2016, Plaintiff's headaches were recorded to be stable with her current medications, although she still

complained of "significant pain." (Tr. 592). Dr. Riser started Plaintiff on a trial dosage of Lexapro to help her with anxiety. (Tr. 746).

In January 2017, Dr. Timothy Parish conducted a consultative physical examination of Plaintiff. (Tr. 690). Dr. Parish opined that Plaintiff was capable of taking care of her daily personal needs such as bathing, dressing, and cooking simple meals. (Tr. 691). In addition, Dr. Parish also recorded Plaintiff could grocery shop with assistance and drive short distances. (Tr. 692). However, Dr. Parish believed that Plaintiff was unable to clean the house or perform yard work due to her body pain. (Tr. 692). Dr. Parish also recorded that Plaintiff had normal thoughts and grossly normal concentration during her examination. (Tr. 692). Plaintiff was able to sit comfortably, get on and off the examination table, and had a normal gait and station without an assistive device. (Tr. 692-93). Dr. Parish noted that Plaintiff had normal flexion in all her extremities, normal reflexes, normal muscle power, normal sensations, normal dexterity, and normal range of motion. (Tr. 693-95). However, Dr. Parish recorded that Plaintiff had tenderness in her spine, SI joint, and in the fibromyalgia trigger points in her right and left trapezius/periscapular. (Tr. 697). Ultimately, Dr. Parish offered the following diagnoses: chronic upper, middle, and lower back pain and total body pain secondary to fibromyalgia; migraines; and anxiety/depression. (Tr. 697).

In April 2018, Plaintiff continued to complain of constant exhaustion, but noted that her headaches had decreased in intensity after getting a Daith piercing in her left ear. (Tr. 783). Plaintiff reported to Dr. Pound with complaints of fatigue, dizziness, headaches, and pain in her muscles, joints, and back despite her medication. (851, 854, 857).

In July 2018, Plaintiff again reported frequent headaches despite taking her medication. (Tr. 1168). She reported to Dr. Laura Black at the Hunter Hopkins Center in Charlotte, North

Carolina, where she complained of pain, fatigue, and brain fog since July 2011 and experiencing headaches long before that. (Tr. 826). Plaintiff informed Dr. Black that, because of her ailments, she was rarely able to leave the house, she was confined to her bed for most of each day, and she was generally unable to do laundry, cook, or perform chores. (Tr. 827). Dr. Black's physical examination of Plaintiff revealed no cyanosis, clubbing, or edema in her extremities. (Tr. 828). However, Dr. Black recorded that 18/18 of Plaintiff's tender points of fibromyalgia were painful, and that she had sternal, vertebral, and bilateral SI joint tenderness, a tense and tight coat area, and myofascial knots and trigger points in her left trap. (Tr. 828). Dr. Black opined that Plaintiff's symptoms were moderate-to-severe while at rest and severe when engaged in activity, and that her overall activity level was reduced by some 30-50%. (Tr. 827). A second MRI of Plaintiff's brain revealed ventricular asymmetry involving the right anterior lateral ventricle and associated circumferential gliosis that could represent a congenital anomaly. (Tr. 1068).

In September 2018, Plaintiff complained of a fibromyalgia flare, body aches, and a week-long migraine. (Tr. 824). Plaintiff stated that her Daith piercing was no longer reducing her migraine frequency, and that she was experiencing headaches at least two or three times a week. (Tr. 824). Lab work revealed that Plaintiff's Vitamin D levels were low; therefore, Dr. Black increased Plaintiff's Vitamin D dosage to 10,000IU daily. (Tr. 825).

In 2019, Plaintiff returned to Dr. Denver with complaints of fibromyalgia, migraines, brain fog, joint pain, and fatigue. (Tr. 798, 814). Plaintiff described her sleep quality as "fair" but rarely restorative. (Tr. 814). She complained of feeling very unrefreshed at times and that she suffered from long periods of morning dysania accompanied by stiffness and brain fog. (Tr. 814). Plaintiff complained of difficulty in multitasking, focusing, driving on unfamiliar routes, and with dizziness. (Tr. 814). In addition, Plaintiff stated that her fatigue was significant and averaged an

8-9/10, but often was higher. (Tr. 814). Plaintiff complained of horrible headaches, but noted that the length of her headaches had improved and were lasting only a day or two at a time since she began taking Topamax. (Tr. 814). Dr. Black's physical examination of Plaintiff revealed a full range of motion but 18/18 tender points for fibromyalgia, joint discomfort bilaterally, and significant knotting of her scapular fascial band. (Tr. 816). In November 2019, Plaintiff informed Dr. Denver that another doctor had prescribed her Adderall, which had helped her fatigue and brain fog. (Tr. 803). However, she continued to suffer from migraines two to three days each week, with some lasting days, and she reported an average pain level of 7/10. (Tr. 803).

During the pandemic in 2020 and 2021, Dr. Denver conducted numerous telephonic evaluations of Plaintiff. (Tr. 867, 872). Plaintiff informed Dr. Denver that there had been no changes since her previous visits, and that she had her thyroid checked by another doctor and it appeared to be normal. (Tr. 867, 872). Plaintiff reported averaging ten migraines each month (Tr. 867, 872, 878) and she informed Dr. Denver that she had low confidence in trying new medication due to her side effects from others; therefore, she requested to stay on the regiment previously prescribed for her. (Tr. 877).

In January 2021, Plaintiff reported that her headaches had been "about the same" while on Topamax, Tramadol, and Flexeril. (Tr. 1173). In April 2021, she noted that her headaches had improved, although they still occurred on a weekly basis. (Tr. 1178). At later appointments, Plaintiff reported that her headaches had been stable and they had decreased to only three a week since she began monthly injections of Aimovig. (Tr. 1183, 1197, 1200).

Dr. Charles Lapp evaluated Plaintiff in June 2021, based on Plaintiff's visits to his office since 2018.[1] (Tr. 1014). According to Dr. Lapp, Plaintiff met the internationally accepted criteria

---

[1] Because Dr. Lapp issued his statement in June 2021, it falls outside of the period under review. However, the Appeals Council remanded the ALJ's October 4, 2021 decision (Tr. 124-134) based on the ALJ's failure to

for chronic fatigue syndrome and he gave the following additional diagnoses: chronic non-malignant pain disorder; sleep disorder; daytime hypersomnolence; mild orthostatic tachycardia; chemical intolerance; migraines; hypothyroidism; hyperlipidemia; plantar fasciitis; pituitary mass; Vitamin D deficiency; depression; and anxiety. (Tr. 1014). Dr. Lapp opined that Plaintiff was unable to tolerate even minimal stress, and that her cognitive disfunction was confirmed by computerized nonpsychiatric testing. (Tr. 1014). Dr. Lapp recorded that Plaintiff was markedly impaired by weakness and exhaustion after minimal everyday activity; post-exertional malaise that prostrated for days; muscle and joint pain; lightheadedness and balance problems; recurrent headaches that interfered with her concentration and dealing with others; sleep disruption that prevented her from keeping normal work hours and led to excessive daytime somnolence; chemical sensitivities; and neurocognitive disfunction. (Tr. 1015). A tilt test confirmed orthostatic tachycardia, with difficulty sitting or standing in place. (Tr. 1015). Further, 18/18 of Plaintiff's tender points for fibromyalgia were inflamed. (Tr. 1015). Dr. Lapp opined that Plaintiff could not stay on task eight hours per day or five days per week, but even if she did, she would miss at least three days per month. (Tr. 1015).

Dr. Riser completed a statement in September 2022 based on his longtime treatment of Plaintiff. (Tr. 1043-46).[2] Dr. Riser opined that Plaintiff could not sustain any type of job at any exertional level for a normal work week, and that Plaintiff's symptoms affected her ability to concentrate, make decisions, and focus on tasks. (Tr. 1043-44). Further, Dr. Riser opined that

---

evaluate Dr. Lapp's opinion. (Tr. 142). The Appeals Council noted that, because Plaintiff began going to Dr. Lapp's office in 2018, Dr. Lapp's official treatment of Plaintiff fell during the period under review and his 2021 statement was relevant to the period at issue. (Tr. 142). The ALJ evaluated Dr. Lapp's opinion in her December 22, 2022 decision. (Tr. 24-36). Thus, the court reviews it here, as well.

[2] Dr. Riser's 2022 statement also falls outside of the period under review. But, like Dr. Lapp, Dr. Riser began examining Plaintiff long before the statement was issued and throughout the period of review. Therefore, for the same reasons the court considers Dr. Lapp's 2021 opinion, the court also considers Dr. Riser's 2022 opinion.

Plaintiff's medical conditions also prevented her from performing any physical activity any more frequently than on an occasionally basis. (Tr. 1044-45).

In the period prior to December 31, 2019 (the date she was last insured), Plaintiff states that she was unable to walk for more than thirty minutes at a time. (Tr. 61). Due to her orthostatic intolerance, she could stand for only fifteen minutes before getting weak or dizzy, and she was unable to sit for more than a couple of hours before getting uncomfortable. (Tr. 61). She could not lift more than five or ten pounds or bend over, and struggled with stopping and squatting. (Tr. 62). Plaintiff had appropriate feeling in her fingertips and could pick up small items without difficulty, but she struggled to hold objects for a long period of time before her fingers went numb. (Tr. 62-63). She complained that she was often unable to leave the house for multiple weeks due to migraines or fatigue. (Tr. 66). On the days where she was not having episodes of migraines or fatigue, Plaintiff stated that she could cook simple meals and handle housework, as long as she took frequent breaks every fifteen to twenty minutes. (Tr. 63, 65). However, her daughter often helped with housework and cooking. (Tr. 64).

At the October 3, 2022 hearing, the ALJ asked a vocational expert ("VE") to assume a hypothetical individual of the similar age, education, and prior work history as Plaintiff who could: lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk six hours each during an eight-hour workday; push and pull as much as lift and carry; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolding; balance, stoop, kneel, crouch, and crawl on an occasional basis; and understand, remember, and carry out simple instructions consistent with unskilled work. (Tr. 67-68). The VE testified that such a hypothetical individual would not be able to perform Plaintiff's past work, but that there were sufficient work opportunities for such an individual, such as a small parts assembler, a laundry folder, or a mail clerk. (Tr. 68).

The ALJ then asked the VE if the jobs would be available for a hypothetical individual with the same limitations as above, but who would be off task twenty percent of the workday. (Tr. 68). The VE testified that no jobs would be available for such a hypothetical individual. (Tr. 68).

## II.    ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as activity that is both "substantial" and "gainful." *Id.* § 1572.  "Substantial" work activity is work that involves doing significant physical or mental activities. *Id.* § 404.1572(a). "Gainful" work activity is work that is done for pay or profit. *Id.* § 404.1572(b). If the ALJ finds that the claimant engages in activity that meets both of these criteria, then the claimant cannot claim disability.  *Id.* § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  *Id.* § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability. *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See id.* §§ 404.1520(d), 404.1525, and 404.1526.   If such criteria are met, the claimant is declared disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work.   *Id.* §

404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  *Id.*  If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  *Id.* § 404.1520(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience.  *Id.* § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. *Id.* §§ 404.1520(g), 404.1560(c).

The ALJ found that Plaintiff has not engaged in substantial gainful employment during the period from her alleged onset date (January 1, 2015) through her date last insured (December 31, 2019). (Tr. 26). Based on the medical evidence presented, the ALJ concluded that Plaintiff had the following severe impairments through her date last insured: fibromyalgia; chronic pain; migraines; depression; and anxiety. (Tr. 26). Nevertheless, the ALJ determined that, through the date last insured, none of Plaintiff impairments or combination of impairments met or medically equaled the severity of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. (Tr. 27).

Next, the ALJ evaluated Plaintiff's testimony and found that Plaintiff's descriptions of the intensity, persistence, and limiting effects of her symptoms were inconsistent with the objective medical evidence. (Tr. 29-34). After consideration of the entire record, the ALJ determined that, through the date last insured, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations: she can lift or carry twenty pounds occasionally and ten pounds frequently; she can sit for six hours in an eight-hour workday; she can stand and/or walk for six hours in an eight-hour workday; she can push and pull as much as she can lift and carry; she can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds;

she can occasionally balance, stoop, kneel, crouch, and crawl; and she is able to understand, remember, and carry out simple, routine, and repetitive instructions consistent with unskilled work. (Tr. 29).

Based on this RFC, the ALJ concluded that Plaintiff was unable to perform any of her past relevant work through the date she was last insured, and that transferability of job skills was not material to the determination of disability. (Tr. 34); *see* 20 C.F.R. Part 404, Subpart P, Appendix 2; SSR 82-41. Nevertheless, the ALJ found that there were significant jobs available in the national economy that Plaintiff could have performed through the date she was last insured, considering her age, education, work experience, and RFC. (Tr. 34). Therefore, the ALJ ruled that Plaintiff was not under a disability, as defined by the Act, at any time from January 1, 2015 (the alleged onset date) through December 31, 2019 (her date last insured). (Tr. 35).

## III.    Plaintiff's Argument for Remand

Plaintiff presents four arguments for remand. First, Plaintiff alleges that the ALJ failed to properly evaluate Plaintiff's headaches and fibromyalgia in finding that they did not meet or medically equal the severity of a listed impairment. Second, Plaintiff argues that the ALJ erred by failing to consider Plaintiff's subjective symptoms and the total limiting effect of those symptoms in determining her RFC. Third, Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of Dr. Riser and Dr. Lapp.[3] Finally, Plaintiff argues that the ALJ failed to consider additional physical and mental limitations when formulating her RFC.

---

[3] The court notes that Plaintiff originally alleged that the ALJ also failed to properly evaluate Dr. Denver's opinion that Plaintiff was unable to work. (Pl.'s Br., Doc. # 10 at 17). However, as the Government points out, any statements about whether a claimant is or is not disabled, is or is not able to work, or is or is not able to perform regular or continuing work are statements on an issue reserved to the Commissioner. 20 C.F.R. § 404.1520b(c)(3)(i). Plaintiff concedes this point in her reply and admits that Dr. Denver's opinion is not a medical opinion the ALJ was required to review. (Pl.'s Br., Doc. # 14 at 5). Therefore, the court need not analyze the ALJ's evaluation of Dr. Denver's opinion.

## IV.     Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.     Discussion

After careful review, the court concludes that although the ALJ did not err in making certain findings, the ALJ erred in discrediting Plaintiff's subjective testimony about pain and in determining Plaintiff's RFC.

14

### A.     The ALJ did not err in finding that Plaintiff's impairments did not meet or equal a listed impairment.

Plaintiff first argues that the ALJ failed to properly evaluate whether Plaintiff's migraines and fibromyalgia met or equaled a listed impairment consistent with SSR 19-4p and SSR 12-2p. A claimant may prove a disability if she shows at step three of the sequential evaluation that her impairments meet or equal a listed impairment. *See* 20 C.F.R. § 404.1520(a)(iii), (d). "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specified criteria of the Listings." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). "To 'equal' a Listing, the medical findings must be 'at least equal in severity and duration to the listed findings.'" *Id.*

Plaintiff argues that the ALJ should have found that her headaches met the criteria of Paragraph B of Listing 11.02. Although SSR 19-4p makes clear that primary headache disorder[4] is not a listed impairment in the Listing of Impairments, primary headache disorder, alone or in combination with other impairments, can be found to medically equal a listing. *See* SSR 19-4p, 2019 WL 4169635, at *7 (Aug. 26, 2019). As the regulations make clear, "Epilepsy (listing 11.02) is the most closely analogous listed impairment for an [medically determinable impairment ("MDI")] of a primary headache disorder. While [it may be] uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02,… and we may find that … her MDI(s) medically equals the listing." *Id.* Indeed, SSR 19-4p states the following regarding Paragraph B of Listing 11.02:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [Acceptable Medical Source ("AMS")] of a typical headache event, including all associated

---

[4] Primary headache disorder includes migraines headaches, tension-type headaches, and cluster headaches. SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019).

> phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of the headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that effects daytime activity, or other related needs and limitations).

*Id.* Plaintiff argues that the ALJ's conclusion that her headaches do not meet the criteria of 11.02B is improper because the ALJ's analysis failed to properly consider evidence that her migraines were equivalent to a listed impairment and instead focused on irrelevant information, such as Plaintiff's lack of hospital records. (Pl.'s Br., Doc. # 10 at 7-9). The court disagrees.

The ALJ was not required to give the level of analysis Plaintiff suggests. To be sure, an ALJ must consider all evidence in determining whether an individual's impairment does or does not medically equal a listing. *See* SSR 17-2p, 2017 WL 3928306, at *4. But, if an ALJ believes that the evidence in the record does not reasonably support a finding that the individual's impairment medically equals a listed impairment, the ALJ is not required to articulate specific evidence supporting his or her finding. *Id.* Instead, "a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding." *Id.*

Here, the ALJ clearly stated that Plaintiff's headaches do not medically equal the requirements of Listing 11.02B. (Tr. 27). Although the ALJ included *some* factual support for her finding, she had no obligation to do so. And, despite Plaintiff's contentions otherwise, there was no requirement for the ALJ to provide any further analysis in support of her finding. *See Prince v. Comm'r Soc. Sec. Admin.*, 551 F. App'x 967, 971 (11th Cir. 2014) ("To the extent [plaintiff] argues

that the ALJ failed to make detailed findings or explicitly discuss whether her impairments met or

equaled [a Listing], this argument is meritless.").

     Plaintiff additionally argues that the ALJ erred at step three by failing to consider whether

Plaintiff's fibromyalgia met or equaled on of the Listing of Impairments. (Pl.'s Br., Doc. # 10 at

9-11). Once again, the court disagrees.

     Fibromyalgia is not included in the Listing of Impairments in Appendix I. However, in

2012, the SSA issued Social Security Ruling 12-2p to clarify that fibromyalgia "can be a basis for

a finding of disability" and to provide guidance on how an ALJ determines whether a claimant has

a medically determinable impairment of fibromyalgia:

> At step 3, we consider whether the person's impairment(s) meets or medically
> equals the criteria of any of the listings in the Listings of Impairments in appendix
> 1, subpart P of 20 CFR part 404 (appendix 1). [Fibromyalgia] cannot meet a listing
> in appendix 1 because [fibromyalgia] is not a listed impairment. At step 3,
> therefore, we determine whether [fibromyalgia] medical equals a listing (for
> example, listing 14.09D in the listing for inflammatory arthritis), or whether it
> medically equals a listing in combination with at least one other medically
> determinable impairment.

*See* SSR 12-2p, 2012 WL 3104869, at *6 (July 25, 2012).

     As Plaintiff points out, although the ALJ found that Plaintiff's fibromyalgia was a severe

impairment at step two, the ALJ did not explicitly reference fibromyalgia at step three of the

analysis. But, that failure does not render the ALJ's analysis incomplete in any way. Rather, the

ALJ's finding that Plaintiff's fibromyalgia did not equal a listing can be implied from the record

and the findings. *See Prince*, 551 F. App'x at 971 (finding no error in the ALJ's failure "to make

detailed findings or explicitly discuss whether [plaintiff's] impairments met or equaled [a] Listing"

because the finding could be implied from the ALJ's discussion of the relevant medical evidence);

*see also Hutchison v. Bowen*, 787 F.2d, 1461, 1463 (11th Cir. 1986) (although ALJ did not

explicitly state that the plaintiff's impairments were not contained in a listing, such a determination was implicit in the ALJ's decision).

At step three of the sequential evaluation process, the ALJ explicitly stated that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 27). This statement alone meets the requirements of the regulations because it makes clear that the ALJ considered all of Plaintiff's impairments and their effects in determining whether any listing was met. *See* 20 C.F.R. § 416.926(c) (requiring only that the ALJ consider all evidence in a plaintiff's case record about her impairments and their effects on her); *see also Silas v. Saul*, 2019 WL 4686802, at *5 (M.D. Fla. 2019).

Additionally, the record shows that the ALJ considered both Plaintiff's fibromyalgia and migraines throughout the entire evaluation process. The ALJ noted that Plaintiff complained of days where she was unable to get out of bed due to her fibromyalgia or migraines. (Tr. 29-30). The ALJ further noted that Plaintiff takes various over-the-counter and prescription medicine for both ailments, but that she has alleged nothing completely controls the pain. (Tr. 30). And, it is also clear the ALJ considered Plaintiff's fibromyalgia and migraines when formulating her RFC:

> [T]he undersigned find that's the claimant's impairments would reasonably limit her to light work as heavy lifting and carrying and prolonged standing and walking may exacerbate her pain. For the same reason, she is limited in her ability to climb and to perform certain postural maneuvers that could exacerbate pain. Due to possible slower reaction time due to pain, as a safety precaution, she should never climb ladders, ropes, or scaffolds. This also poses a fall risk that could exacerbate pain. Due to brain fog and potential cognitive deficits from her fibromyalgia, as well as to reduce job pressures and stress that could exacerbate both depression and anxiety, the claimant is limited to unskilled work.

(Tr. 34).

It is evident from the record that the ALJ considered both Plaintiff's migraines and fibromyalgia at all stages of the evaluation. To be sure, that is not to say that the ALJ *properly* evaluated these ailments or ultimately reached the correct conclusion in finding that Plaintiff was not disabled. The court examines those questions below. But, the court is satisfied the ALJ did not err in failing to properly evaluate whether Plaintiff's migraines and fibromyalgia met or equaled a listed impairment.

**B.      The ALJ improperly discredited both Plaintiff's subjective testimony regarding pain and the medical opinions in determining Plaintiff's RFC.**

Plaintiff additionally argues that the ALJ erred by failing to consider Plaintiff's subjective symptoms and the total limiting effect of these symptoms in determining her RFC, as well as by failing to properly evaluate the medical opinions in the record. As these issues are intertwined, the court considers them together.

The Eleventh Circuit has developed a "pain standard" that applies when a disability claimant attempts to establish a disability through her own testimony about pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.3d 1221, 1223 (11th Cir. 1991); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The pain standard requires: "(1) evidence of an underlying medical condition *and either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt*, 921 F.3d at 1223. (emphasis added). If a claimant testifies about her chronic pain, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations. *Holt*, 921 F.3d at 1223.

Although the same pain standard applies to plaintiffs claiming they suffer from fibromyalgia, the Eleventh Circuit has "loosened the need for objective medical evidence … 'because the hallmark of fibromyalgia is a lack of objective evidence [such that] a claimant's

subjective complaints may be the only means of determining the severity of [her] condition and the functional limitations she experiences.'" *Vasquez v. Comm'r of Soc. Sec.*, 2022 WL 909754, at *5 (M.D. Fla. 2022) (quoting *Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x 855, 863 (11th Cir. 2017) (internal citations omitted)). Indeed, a panel of the Eleventh Circuit has made clear that an ALJ's undue emphasis on the lack of objective findings to substantiate a plaintiff's fibromyalgia-related reports is error. *See Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 63 (11th Cir. 2010) ("The lack of objective clinical findings is, at least in the case of fibromyalgia, … insufficient alone to support an ALJ's rejection of a treating physician's opinion as to the claimant's functional limitations."); *see also Witherell v. Berryhill*, 2019 WL 1397927, at *4 (M.D. Fla. 2019) (ALJ's undue emphasis on lack of objective findings in evaluating fibromyalgia complaints required remand).

Here, the ALJ did not dispute Plaintiff's fibromyalgia diagnosis and concluded it was a severe impairment at step two – along with her migraines, chronic pain, depression, and anxiety. (Tr. 26). However, in formulating the RFC, the ALJ found that, while Plaintiff's medically determinable impairments (including fibromyalgia) could reasonably be expected to produce the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of these symptoms were not consistent with the objective medical evidence:

> [Plaintiff] alleges debilitating symptomology and limitations, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment. The description of the symptoms and limitations, which [Plaintiff] has provided throughout the record, has generally been inconsistent and unpersuasive. While it is reasonable [Plaintiff] may experience some symptoms that would cause some exertional and non-exertional limitations, the objective medical evidence does not support a finding of disability.

(Tr. 30). This statement is erroneous for at least two reasons.

First, the ALJ improperly discredited Plaintiff's statements about the severity of her symptoms and her functional limitations. The ALJ found that Plaintiff's description of her symptoms and limitations was unpersuasive simply because it was not supported by the objective medical evidence. (Tr. 30). But again, "the 'hallmark' of fibromyalgia is a <u>lack of objective</u> <u>evidence.</u> *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To be sure, Plaintiff alleges other ailments, in addition to fibromyalgia, that can be verified or discredited through objective medical evidence. But, the court cannot discern from the ALJ's broad rejection of Plaintiff's statements exactly *which* of Plaintiff's symptoms and limitations the ALJ found to be unsupported by the objective medical evidence. In this situation, the court can only assume that the ALJ treated Plaintiff's statements about <u>all</u> of her impairments equally during the two-step pain evaluation process, and, as a result, must assume that the ALJ specifically found Plaintiff's statements about her fibromyalgia symptoms to be unsupported by the objective evidence. *See* (Tr. 30) ("While it is reasonable the claimant may experience some symptoms that would cause some exertional and non-exertional limitations, the objective medical evidence does not support a finding of disability."). Such an approach is improper and necessitates remand. *See Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) ("It is well established that reversible error exists if complaints of subjective pain are disregarded simply because they are not supported by objective clinical and laboratory medical findings."); *Somogy*, 366 F. App'x at 63.

But, that is not the only reason remand is appropriate. Even if the court were able to conclude that the ALJ properly evaluated Plaintiff's subjective symptoms (and to be clear, the court finds the ALJ did not), the ALJ's decision is still due to be remanded because other medical evidence actually <u>does</u> support a finding that Plaintiff is disabled. Although Plaintiff tried numerous medications and dosage levels, Plaintiff never reported that her headaches completely

subsided. Instead, Dr. Riser's medical reports show that, even when Plaintiff's headaches were at their best and "stable" after starting monthly injections of Aimovig, Plaintiff still suffered from at least two to three migraines a week, each lasting several hours at a time. (Tr. 1178, 1183, 1197, 1200). Because of this, Dr. Riser opined that Plaintiff could not sustain any type of job for a normal workweek at any exertional level, and that her symptoms would affect her ability to concentrate, make decisions, focus on tasks and would prevent her from climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling more than occasionally. (Tr. 1043-45). Dr. Riser believed that Plaintiff could not occasionally or frequently lift over ten pounds; could not stand or walk for two hours in a workday; could not sit for more than six hours in a workday; and could not frequently handle or finger objects. (Tr. 1045).

Substantial evidence also supports a finding of debilitating fibromyalgia. Although it is true that fibromyalgia often lacks objective medical evidence to support its diagnosis, the presence of fibromyalgia can be objectively verified by the presence of tender points. *See Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1249-50 (N.D. Ala. 2003) (*citing Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996)). Here, Dr. Lapp, Dr. Black, Dr. Denver, and Dr. Parish all recorded that Plaintiff had painful tender points. (Tr. 697, 701, 816, 828). In fact, Dr. Black recorded on multiple occasions that 18/18 of Plaintiff's tender points for fibromyalgia were painful. (Tr. 816, 828). Further, Dr. Lapp opined that Plaintiff was markedly impaired by weakness and exhaustion after minimal everyday activity; post-exertional malaise that could prostrate her for days; muscle and joint pain; lightheadedness and balance problems; recurrent headaches that interfered with concentration and dealing with others; sleep disruption that prevented her from keeping normal work hours and led to excessive daytime somnolence; chemical sensitivities; and neurocognitive disfunction. (Tr. 1015). *See Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1366 (N.D. Ga. 2001)

(remand was appropriate because, apart from muscle and soft tissue pain, the most common symptoms of fibromyalgia are undue fatigue, trouble sleeping, and joint pain).

The medical opinions and objective evidence confirm that Plaintiff often displayed multiple tender points, satisfying at least that aspect of a fibromyalgia diagnosis, and often reported fatigue, joint pain, and concentration problems. Under the applicable regulations, the more a medical source presents objective medical evidence and explanations to support their opinions, the more persuasive the medical opinion will be.[5] 20 C.F.R. § 404.1520c(c)(1). Further, the more consistent the medical opinion is with the evidence from other medical sources and nonmedical sources, the more persuasive the medical opinion will be. 20 C.F.R. § 404.1520c(c)(2). Despite their consistency with other medical evidence, the ALJ found Dr. Riser's and Dr. Lapp's opinions to be unpersuasive:

> [Dr. Riser's] opinion is not persuasive because it is not entirely supported by or consistent with the evidence. [Plaintiff] certainly has some limitations, but not as extreme as opined by Dr. Riser. [Plaintiff] has reported morning stiffness, but good pain control with Tramadol. She reported an average pain level of 4. She reported that her migraines were controlled by her medication. She had fairly normal physical examinations with only some tenderness throughout. There were times she did not mention pain. She has normal sensation. …
>
> [Dr. Lapp's] opinion is not persuasive because it is not entirely supported by or consistent with the evidence. [Plaintiff] certainly has limitations, but the evidence does not support such extreme limitations. [Plaintiff] reported morning stiffness, but her pain was well controlled with Tramadol. She has some limitations on

---

[5] The regulatory framework for reviewing medical evidence has changed for claims filed after March 17, 2017. *See* 20 C.F.R. § 404.1520c. Because Plaintiff filed her application in May 2020, the new regulations apply. *Id.*; *see Glover v. Comm'r, Soc. Sec. Admin.*, 2022 WL 17826364, at *3 (11th Cir. 2022). Under the new regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [Plaintiff's] medical sources. *Id.* at § 404.1520c(a). Rather, an ALJ must evaluate each medical opinion using five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. *Id.* at § 404.1520c(c). Further, an ALJ must state in the written decision the extent to which there is a finding that the medical opinions and prior administrative medical findings in the record are persuasive. *Id.* at § 404.1520c(b). Supportability and consistency are the most important factors an ALJ considers when determining the persuasiveness of medical source opinions. *Id.* at § 404.1520c(b)(2). Therefore, in making a determination, an ALJ is required to explain how the supportability and consistency factors were considered in relation to a medical source's opinion. *Id.*

examination, but her examination at her CPE during her period under review was fairly normal except for spine tenderness.

(Tr. 31, 33). Those findings are not supported by substantial evidence on this record.

The ALJ's analysis of the medical opinions of Dr. Riser and Dr. Lapp, when compared to the other evidence in the record, constituted an improper cherry-picking of facts that support a finding of non-disability and ignored evidence that pointed to a disability finding. *See Dicks v. Colvin*, 2016 WL 4927637, at *4 (M.D. Fla. 2016) ("[A]n ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability…"). In fact, some of the ALJ's statements in this analysis are simply incorrect. Although the ALJ stated that Plaintiff *averaged* a pain level of 4/10, Plaintiff's *best* reported pain level in 2018 and 2019 was a 4/10. (Tr. 788, 798, 803). Actually, Plaintiff repeatedly reported average pain levels of 6/10, 7/10 or 8/10, but also noted that her pain levels got as high as 9/10 and 10/10. (Tr. 703, 706, 769, 793, 798, 803). Likewise, although the ALJ stated that "Plaintiff reported her migraines were controlled by her medication," the medical evidence shows just the opposite; Plaintiff's migraines would often respond to changes in medication initially, but she consistently stated that she suffered severe migraines even while on medication. (Tr. 736, 741, 748). In fact, during her best recorded period, Plaintiff still suffered from at least three migraines each week – despite being on numerous medications. (Tr. 1197, 1200). *See Hendricks v. Comm'r of Soc. Sec.*, 2023 WL 6302173, at *4 (N.D. Ala. 2023) (finding remand appropriate where the evidence shows that plaintiff continued to have migraines despite medication).

It is not enough for an ALJ to select one piece of evidence in a medical opinion that supports her decision and disregard other contrary evidence. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). But, that is precisely what occurred here. While the medical source opinions were not identical, <u>every</u> medical professional who provided long-term treatment to Plaintiff

opined that she was far more limited than the limitations the ALJ included in the RFC. Against this backdrop, the court cannot say that the ALJ adequately analyzed the supportability and consistency of the medical source opinions.

In sum, the court concludes the ALJ's decision to discredit Plaintiff's subjective allegations regarding her pain and limitations associated with her fibromyalgia was improper to the extent it was based solely on a lack of objective medical evidence. In addition to that error, the ALJ failed to properly analyze the supportability and consistency of the medical opinion evidence. Therefore, remand is appropriate.[6]

## VI.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence and improper legal standards were applied. The Commissioner's final decision is therefore due to be reversed and remanded. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this August 30, 2024.

_R. David Proctor_
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE

---

[6] Plaintiff also asserts that that the ALJ failed to consider several of her additional physical and mental limitations when formulating her RFC. (Pl.'s Br., Doc. # 10 at 18-25). In light of this remand, the court need not address Plaintiff's remaining contention of error. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (stating that where is remand is required, it may be unnecessary to review other issues raised). But, her arguments in this respect are highlighted for consideration by the ALJ.